UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



STANLEY GOODRUM,
Petitioner

V.

COMMISSIONER OF CORRECTION,
Respondent

PRISONER
CASE NO. 3:02CV235(AWT)(DRM)

MAY 7, 2004

## MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

This memorandum is submitted in opposition to the application for writ of habeas corpus filed in the above-captioned proceeding. The petitioner claims that (1) the trial court failed to adequately address the issue of counsel's conflict of interest and (2) he was denied the effective assistance of counsel at his 1993 criminal trial. For the reasons set forth below, the petitioner is not entitled to federal habeas corpus relief and his petition for writ of habeas corpus must be dismissed.

### I. PROCEDURAL HISTORY

This procedural history is compiled from documents forwarded as appendices to the respondent's Answer dated May 7, 2004, as follows:

Appendix A   Connecticut Appellate Court's decision on direct appeal;
State v. Goodrum, 39 Conn. App. 526, 529, 665 A.2d 159,
cert. denied, 235 Conn. 929, 667 A.2d 554 (1995)

Appendix B   Connecticut Appellate Court's decision on appeal from state
habeas court's decision, Goodrum v. Commissioner of
Correction, 63 Conn. App. 297, 776 A.2d 461 (2001)

Appendix C   Record on appeal from the state habeas court's decision

Appendix D   Petitioner's brief on appeal from the state habeas court's
decision

Appendix E    Respondent's brief on appeal from the state habeas court's decision

Appendix F    Petitioner's reply brief on appeal from the state habeas court's decision

Appendix G    Petitioner's petition for certification to appeal the decision of the Connecticut Appellate Court

Appendix H    Connecticut Supreme Court's decision denying the petitioner's petition for certification to appeal; Goodrum v. Commissioner of Correction, 258 Conn. 902, 782 A.2d 136 (2001)

Appendix I    Transcript of state habeas trial of November 1, 1996

Appendix J    Transcript of state habeas trial of November 5, 1996

Appendix K    Transcript of state habeas trial of November 7, 1996

In May 1993, the petitioner entered a plea of guilty to a charge of possession of marijuana. Thereafter, he was tried and convicted after a jury trial, Hadden, J., presiding, of possession of narcotics with intent to sell by a non-drug-dependent person in violation of General Statutes § 21a-278(b), conspiracy to sell narcotics in violation of §§ 53a-48(a) and 21a-278(b), possession of marijuana in violation of § 21a-279(c), and five counts of violation of probation. He was sentenced to a term of imprisonment of twenty-five years, execution suspended after eighteen years, and five years probation.

The petitioner appealed. On September 26, 1995, the Connecticut Appellate Court affirmed the "the conviction with respect to the charges of possession of narcotics with intent to sell by a person who is not drug-dependent, possession of marijuana, and violation of probation." State v. Goodrum, 39 Conn. App. 526, 529, 665 A.2d 159, cert. denied, 235 Conn. 929, 667 A.2d 554 (1995) (hereinafter "Goodrum I"). It reversed "the

2

conviction on the charge of conspiracy to sell narcotics" because it concluded "that the evidence adduced at trial was insufficient as a matter of law to support the conviction on the conspiracy count." Id.

Meanwhile, in June 1994, the petitioner filed a petition for writ of habeas corpus in the Superior Court for the judicial district of New Haven. Subsequently, counsel was appointed to represent the petitioner. Eventually, his claims were described in a "Second Amended Petition" dated July 26, 1996. Appendix C at 2-16. The habeas court heard evidence in support of the petition at a trial held on November 1, 5, and 7, 1996. In a written memorandum of decision dated November 18, 1996, the state habeas court denied the petition and judgment entered on November 22, 1996. Appendix C at 22-32. The petitioner filed a petition for certification to appeal which was granted on December 16, 1996. Appendix C at 1, 33-34. On that same day, the state habeas court also granted the petitioner's motion for waiver of costs and fees. Id. at 1.

The petitioner did not file his appeal until January 16, 1997. Appendix C at 36, 39. On April 23, 1997, the Connecticut Appellate Court dismissed that appeal as untimely filed. Id. at 36. The petitioner then filed a motion for permission to file a late appeal. That motion was denied on June 18, 1997. Id.

In September 1997, the petitioner filed another state habeas corpus petition. Stanley Goodrum v. Commissioner of Correction, Docket No. CV97-0404745, Superior Court in the judicial district of New Haven. The parties entered into a stipulation under which the petitioner's ability to appeal the decision of the first state habeas court would be reinstated. Appendix C at 36-37. On February 19, 1999, the second state habeas court

3

entered an order in accordance with the stipulation and restored the petitioner's ability to appeal the decision of the first state habeas court. Appendix C at 35.

On May 8, 2001, the Connecticut Appellate Court affirmed the judgment of the state habeas court. Goodrum v. Commissioner of Correction, 63 Conn. App. 297, 776 A.2d 461 (2001) (hereinafter "Goodrum II"). In the Connecticut Supreme Court, the petitioner filed a petition for certification to appeal the decision of the Appellate Court. That petition was denied on September 13, 2001. Goodrum v. Commissioner of Correction, 258 Conn. 902, 782 A.2d 136 (2001).

On February 7, 2002, the petitioner initiated the instant proceeding pursuant to 28 U.S.C. § 2254. In his amended petition, the petitioner claims that "(1) the trial court failed to address adequately the issue of counsel's conflict of interest and (2) trial counsel provided inadequate assistance by virtue of counsel's inadequate cross-examination of the witness regarding the paper bag and rubber bands, counsel's failure to request jury instructions regarding non-exclusive possession, counsel's failure to object to the charge on consciousness of guilt, counsel's failure to preserve this claim for direct appeal, and counsel's improper advice regarding the guilty plea." Ruling and Order [Doc. # 41] at 3.

## II. FACTS UNDERLYING THE PETITIONER'S CONVICTION

On direct appeal, the Connecticut Appellate Court determined that the jury could have reasonably found the following facts.

> In January, 1992, the New Haven police conducted an undercover narcotics investigation that focused on three residences: 265 Dixwell Avenue, 377 Shelton Avenue and 35 Elizabeth Street. During the investigation, detectives saw the defendant enter and exit each location and saw him use his a key

4

to enter 265 Dixwell Avenue. On January 7, the detectives obtained a warrant to search all three residences.

On the morning of January 9, Detective Thomas Trochio and Detective Hilton Wright saw the defendant leave his residence at 377 Shelton Avenue and drive to 265 Dixwell Avenue where the defendant's brother, Moses Pipkin, and son resided. The detectives saw the defendant leave his car and enter 265 Dixwell Avenue carrying a brown paper bag. The defendant used a key to enter the front door of the building. The detectives did not see which apartment the defendant entered.

The detectives returned to the police station to assemble a team of police officers for the purpose of executing the search warrants. They returned to 265 Dixwell Avenue approximately thirty minutes later, knocked on the door to apartment A-1 and announced that they had a search warrant. The defendant was not present. In the apartment were Pipkin and Gloria Daniels.

The police searched the apartment and found a brown paper bag with a McDonald's logo in which were 200 packets containing 7.06 grams of heroin. The packets were stamped with the words "raising hell" and wrapped in rubber bands. The police also recovered nineteen packets of heroin identical to those found in the brown paper bag, nine packets containing approximately 1.33 grams of cocaine found on Daniels, with the box for a beeper with instructions, a piece of wrapping paper addressed to the defendant at 265 Dixwell Avenue, and a Quaker Oats grits container filled with rubber bands. Written on the top of the grits container was "IOU Stan and Betty. 10-C 12-P." The officers arrested Pipkin and Daniels.

The police then proceeded to 377 Shelton Avenue to execute that portion of the warrant. The defendant and Ruth Ford were found there. Upon searching the defendant, the police found a beeper with the same serial number that was on the instructions in the beeper box found at 265 Dixwell Avenue and keys later determined to be for the front door to apartment A-1. When the police asked the defendant how much money he had in his wallet, he said, "$30 or $40." A subsequent search of the defendant's wallet revealed $307, mostly $20 bills.

At the Shelton Avenue residence, the police also found $1554.50, primarily in $1 bills, stored in a plastic water bottle, a jacket similar to that the defendant had been seen wearing earlier that day, six packets of marijuana, and a tray containing marijuana residue and seeds.

5

At trial, Pipkin testified that he had been hospitalized for three weeks and had returned to his apartment at 265 Dixwell on January 8. Pipkin stated that he gave the defendant the keys to his apartment while he was in the hospital, and that the defendant was the only person with keys to his apartment. He testified that the McDonald's bag was not in his apartment when he returned home on the evening of January 8, or when he left the apartment early the following morning.

Pipkin further testified that when he returned to his apartment on January 9, the defendant was leaving the building and was not carrying the paper bag. He denied that the 200 packets in the paper bag were his. He stated that he first learned of that bag when the police arrived shortly thereafter and found it during their search. Pipkin pleaded guilty to charges of possession of narcotics with intent to sell and conspiracy to sell narcotics.

Trochio testified that, in his experience and training, a user of heroin is not likely to be found with 200 packets of heroin. He also testified that the packaging of the heroin into $20 bags indicated a large scale drug operation. Wright testified that "P-dope" is a street term for heroin.

Goodrum I, 39 Conn. App. at 529-31.

## III.   ARGUMENT

In his petition to this Court, the petitioner claims that his state conviction is unlawful because (1) the trial court failed to adequately address the issue of counsel's conflict of interest and (2) he was denied the effective assistance of counsel at his 1993 criminal trial. For the reasons set forth below, the decision of the Connecticut Appellate Court is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the petitioner is not entitled to habeas corpus relief and his petition must be dismissed.

### A.   Standard Of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a writ of habeas corpus "may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the

6

Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[1] The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta," of the High Court's "decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412, 120 S.Ct. at 1523.

A state court decision is "contrary to" clearly established Federal law if it falls within one of two scenarios. Under the first scenario, a state-court decision will be contrary to "clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." Williams, 529 U.S. at 405, 120 S.Ct. at 1519. As for the second scenario, the Court explained that a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Id. at 406, 1519-20.

If a state-court decision is not "contrary to" U.S. Supreme Court precedent, the federal habeas court must determine whether the state court's decision involved an "unreasonable application" of clearly established Federal law. In so doing, a federal

---

[1] Justice O'Connor delivered the opinion of the Court with respect to Part II in which it determined that the Antiterrorism and Effective Death Penalty Act (AEDPA) modified the role played by federal habeas courts in reviewing petitions filed by state prisoners and interpreted § 2254(d)(1). Justice Stevens delivered the opinion of the Court with respect to Parts I, III, and IV.

7

habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409, 120 S.Ct. at 1521. Thus, courts must apply an objective standard. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410, 1522. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 1522.

Once this standard is applied to the claims raised by the instant petitioner, it becomes clear that federal habeas corpus relief is unwarranted and the petition must be dismissed.

**B.   The Petitioner's Claim That His Counsel Was Burdened By An Actual Conflict Of Interest Is Without Merit**

In his first claim, the petitioner alleges that his trial attorney labored under an actual conflict of interest and that the trial court was aware of this alleged conflict but failed in its duty to inquire into the conflict and canvass the petitioner as to whether he understood his right to conflict-free representation and waived that right. In his petition, he asserts that "[m]y attorney represented both me and a co-conspirator (separately charged) throughout pretrial proceedings and throughout the state's case. My attorney then called the co-conspirator as a witness. The trial judge appointed separate counsel for the co-conspirator but DID NOT [ask] me if I WAIVED the conflict, which I did not. My attorney continued to be loyal to the co-conspirator right through sentencing." Second Amended Petition

8

[Doc. # 38] at 6. For the reasons discussed below, the petitioner is not entitled to relief on his claim.

### 1. The state court's ruling on the petitioner's claim

On appeal from the state habeas court's decision, the Connecticut Appellate Court determined that the following facts were relevant to the petitioner's claim:

> At the time of his arrest, the petitioner was living at 377 Shelton Avenue with his girlfriend, [Ruth] Ford. The police also arrested Ford and charged her with possession of a controlled substance and conspiracy to sell narcotics. The petitioner and Ford retained the same counsel to represent them in their respective cases. The petitioner went to trial first. Counsel obtained continuances on Ford's case and expended no other efforts on her behalf, since he believed that the state would not pursue the charges against her. At trial, the petitioner called Ford as his first witness. The court, noticing that her attorney of record was also the petitioner's attorney, called the situation "intolerable" and immediately appointed a special public defender to represent her.

\* \* \*

> When the matter of the dual representation by counsel of both the petitioner and Ford was brought to the trial court's attention, it conducted an immediate inquiry and appointed a special public defender to represent Ford. Her testimony at the hearing revealed that, although counsel had been retained to represent both Ford and the petitioner, she in fact had never spoken with counsel and had been present only when he conversed with the petitioner. Counsel had requested continuances of her case on her behalf and nothing more. Ford never discussed her case or the petitioner's case with counsel prior to the appointment of the special public defender to represent her. Her special public defender advised her not to testify, and the court advised her regarding her fifth amendment right not to incriminate herself. Nevertheless, she chose to testify and her testimony was very favorable to the petitioner. Ford's case subsequently was nolled.[2]

---

[2] "Ford, a schoolteacher, shared a home with the petitioner for twelve years at the time of trial and, by all accounts, had nothing to do with the drug operation the petitioner was accused of running." Goodrum II, 63 Conn. App. at 318 n.15.

9

Goodrum II, 63 Conn. App. at 316 and 317-18.

The Connecticut Appellate Court analyzed and then resolved the petitioner's claim as follows:

> Pursuant to the state and federal constitutions, "a criminal defendant is entitled to be represented by an attorney free from conflicts of interest." (Internal quotation marks omitted.) State v. Webb, 238 Conn. 389, 417, 680 A.2d 147 (1996). The test for an alleged conflict of interest differs from that for ineffective assistance claims generally. "In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of [his constitutional rights], the [petitioner] has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) State v. Crespo, 246 Conn. 665, 689, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S.Ct. 911, 142 L.Ed.2d 909 (1999), citing Phillips v. Warden, supra, 220 Conn. at 133, 595 A.2d 1356.
>
> "Cases involving conflicts of interest usually arise in the context of representation of multiple codefendants by one attorney where the attorney adduces evidence or advances arguments on behalf of one defendant that are damaging to the interests of the other defendant. . . . A conflict of interest also arises if trial counsel simultaneously represents the defendant and another individual associated with the incident and that representation inhibits counsel's ability to represent the defendant." (Citation omitted; internal quotation marks omitted.) State v. Cruz, 41 Conn. App. 809, 812, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996). "[O]ne of the principal safeguards of [the right to conflict free representation] is the rule announced by [our Supreme Court] that '[a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict....' " State v. Martin, 201 Conn. 74, 79, 513 A.2d 116 (1986).
>
> * * *
>
> "We have had occasion to point out the caution from the United States Supreme Court that the *possibility* of conflict is insufficient to impugn a criminal conviction. . . . Cuyler v. Sullivan, [446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)]. To demonstrate an actual conflict of interest, the petitioner must be able to point to *specific instances* in the record which suggest impairment or compromise of his interests for the benefit of another party." (Emphasis in original; internal quotation marks omitted.) Whyte v.

10

Commissioner of Correction, 53 Conn. App. 678, 689, 736 A.2d 145, cert. denied, 250 Conn. 920, 738 A.2d 663 (1999).

> The petitioner in his brief only speculates as to the possibility that his counsel compromised his interest for Ford's benefit. He argues that counsel would have pursued a drug dependency defense if he were not worried about incriminating Ford, but points to no evidence in the record in support of that assertion. As discussed in part III, counsel's choice in that regard reflects a reasonable trial strategy. The petitioner also contends that had there been no conflict, counsel would have "question[ed] . . . Ford's involvement" to prevent the petitioner from being "set up as the bad guy." There is no indication in the record, however, that Ford was involved in the drug operation in any way. As previously mentioned, her case subsequently was nolled. Furthermore, because separate counsel was appointed for Ford prior to her taking the witness stand to testify, the petitioner's counsel was free to question her in any manner he saw fit. As such, the petitioner has not demonstrated a violation of his right to counsel predicated on an actual conflict of interest.

Goodrum II, 63 Conn. App. at 316-17 and 318-19.

### 2. The Appellate Court's decision that no actual conflict of interest existed was not unreasonable

The petitioner claims that his attorney's representation of his co-defendant, Ruth Ford, created a conflict of interest and that the trial court failed to ascertain that he waived that conflict. The petitioner has failed to establish that his counsel actively represented competing interests or that such representation adversely affected his lawyer's performance. For these reasons, the petitioner's claim is without merit and habeas corpus relief must be denied.

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Multiple representation, however, does not violate the Sixth Amendment unless it gives rise to an

11

actual conflict of interest. Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). See Glasser v. United States, 315 U.S. 60, 92, 62 S.Ct 457, 475, 86 L.Ed. 680, (1942) (Frankfurter, J., dissenting) (a "common defense often gives strength to a common attack").[3] "[T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. . . . But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." (Emphasis added.) Cuyler v. Sullivan, 446 U.S. at 350, 100 S.Ct. at 1719. If a petitioner can demonstrate that his attorney was burdened by an actual conflict of interest that adversely affected the lawyer's performance, he need not prove that such conflict prejudiced him. Rather, prejudice will be presumed. Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

In the instant case, the same attorney who represented the petitioner also represented his co-defendant, Ruth Ford. Before Ford took the stand to testify on the petitioner's behalf, the trial court removed the attorney from his representation of Ford and appointed a special public defender to represent her. At that point, Ford became a *former* client of the petitioner's counsel. Despite her new attorney's advice, Ford chose to testify on the petitioner's behalf and "her testimony was very favorable to the petitioner."

---

[3] In his brief to the Connecticut Appellate Court, the petitioner conceded that he "and Ford had a mutual defense that neither had possession of the narcotics." Appendix D at 22.

12

Goodrum II, 63 Conn. App. at 318. Under these circumstances, counsel did not actively represent an interest that conflicted with the petitioner's and the alleged conflict did not adversely affect his performance. For example, there is no evidence that the attorney received information through his communications with Ford that he had to refrain from using in the petitioner's defense because of its privileged nature.

In his brief to the Connecticut Appellate Court, the petitioner argued that the alleged conflict adversely affected counsel's performance because (1) he could not raise a drug dependency defense given Ford's testimony that she never saw the petitioner use drugs and (2) counsel could not question Ford about her involvement in the case without damaging Ford's case. Appendix D at 15. Both arguments are nothing more than speculation. Obviously, the petitioner's defense was to challenge the possession element of the charges. The drug-dependency defense merely operates to eliminate the mandatory minimum sentence--not to absolve the defendant of all liability.[4] To raise a drug dependency defense, a defendant generally admits to possessing drugs. Otherwise, he

---

[4] "The petitioner was convicted of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of § 21a-278(b). Drug dependency is an affirmative defense to a charged violation under that statute. Thus, a drug-dependent defendant may be exempt from liability under § 21a-278 if he or she proves that dependency by a preponderance of the evidence. . . . A person exempt from liability under § 21a-278 by virtue of drug dependency still may be held liable under § 21a-277, which proscribes similar conduct. . . . 'The difference between these statutes is not in their elements but in the potential mandatory minimum sentence provision of § 21a-278(b). If the defendant does not prove by a preponderance of the evidence that he is drug-dependent, he is subject to the mandatory minimum sentence of § 21a-278(b), whereas, if he proves that he is drug-dependent, the mandatory minimum sentence does not apply. . . .' 'The design and effect of § 21a-278(b) is to punish persons who are not drug-dependent and sell narcotics more severely than drug-dependent persons who sell narcotics. . . .' " (Citations omitted.) Goodrum II, 63 Conn. App. at 313-14.

13

is placed in the position of raising conflicting defenses by claiming that he did not possess the drugs, but if he did, he did so because he was drug dependent. Had the petitioner and his counsel chosen to assert a drug-dependency defense, they would not have called Ford as a witness at all because she would have testified that she never saw the petitioner using drugs.

Alternatively, the petitioner argued that counsel could not question Ford about her involvement without damaging Ford's case. This argument assumes that counsel continued to worry about the consequences that Ford could suffer as a result of her testimony <u>after</u> he was disqualified from representing her. Clearly, however, Ford wanted to testify despite the judge's warning of the dangers of testifying <u>and</u> her new attorney's advice not to do so. Moreover, the petitioner's argument assumes that, had Ford been questioned about her involvement, she would have incriminated herself. No evidence was presented, however, to support this theory. <u>See</u> Ford's testimony; Appendix K; Transcript (11/7/96) at 25-35. As a result, the petitioner has not demonstrated that his counsel actively represented conflicting interests and his claim must fail under the standards discussed in <u>Cuyler v. Sullivan</u>.

Moreover, whether <u>Cuyler</u> even controls the resolution of the petitioner's claim is questionable. Recently, the High Court noted that its decision in <u>Cuyler v. Sullivan</u> has been applied "'unblinkingly' . . . 'to all kinds of alleged attorney ethical conflicts. . . .'" (Citation omitted.) <u>Mickens v. Taylor</u>, 535 U.S. 162, 174, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002). Numerous courts "have invoked the <u>Sullivan</u> standard not only when (as here) there is a conflict rooted in counsel's obligations to former clients . . . but

14

even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal . . . a job with the prosecutor's office . . . the teaching of classes to Internal Revenue Service agents . . . a romantic 'entanglement' with the prosecutor . . . or fear of antagonizing the trial judge. . . ." Mickens, 535 U.S. 174-75, 122 S.Ct. at 1245. The Court then went on to state that "[i]t must be said, however, that the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application." Id. In conclusion, the Court held that in "resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the Sullivan prophylaxis in cases of successive representation. Whether Sullivan should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." Mickens, 535 U.S. at 176, 122 S.Ct. at 1246.

In Mickens, a death penalty case, the Court was presented with a fact pattern in which the defendant's lead counsel had briefly represented the deceased victim in a juvenile matter. Thus, the issue presented did not concern multiple, concurrent representation but, rather, the possibility of a conflict arising from counsel's representation of a former client. The U.S. Supreme Court indicated that it has never determined that prejudice will be presumed in cases where an alleged conflict of interest is not the result of simultaneous multiple representation. As a result, the standard to be used in analyzing the petitioner's "conflict" claim is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Mask v. McGinnis, 252 F.3d 85, 90 (2d Cir. 2001) (a petitioner's reliance on lower court opinions is insufficient). If a petitioner's claim is not supported by U.S. Supreme Court precedent, federal habeas relief

must be denied, irrespective of how a lower federal court believes the High Court might resolve the issue if confronted with it. Williams, 529 U.S. at 412, 120 S.Ct. at 1523; Houston v. Roe, 177 F.3d 901, 905-06 (9th Cir. 1999); Bocian v. Gondinez, 101 F.3d 465, 471 (7th Cir. 1996). If the petitioner's claim is not subject to analysis under Cuyler v. Sullivan, then he is not entitled to the more favorable standard reserved for "conflict" claims and his claim must be reviewed under the principles established in Strickland v. Washington.

Under either standard, however, the petitioner cannot prevail on his claim because he has not shown that counsel actively represented conflicting interests. As a result, the Connecticut Appellate Court's decision is not contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Therefore, his claim must fail.

### 3. The petitioner cannot prevail on his claim that the trial court failed to inquire into the alleged conflict

The petitioner also suggests that the trial court failed in its "duty to inquire into the conflict and canvass the petitioner as to whether he understood his right [to conflict-free representation] and waived that right." Appendix D at 22. Of course, in this case, the trial court went beyond inquiring into the alleged conflict. It eliminated the conflict by disqualifying the petitioner's attorney from representing Ford and appointing new counsel for Ford. In his appeal to the Connecticut Appellate Court, the petitioner argued that the trial court's failure to inquire into the conflict and canvass the petitioner as to whether he understood his right to conflict-free representation and waived that right required an